CLERKS OFFICE U.S. DIST. COURT
LYNCHBURG, VA
FILED
March 16, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ B. McAbee
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

**MATTHEW REEVES,**

**Plaintiff,**

**v.**

**Civil Action No.** 6:26cv28

**TYSON FARMS, INC.,**
**Serve:**
**United Agent Group Inc., Registered Agent**
**425 W. Washington St.**
**Suite 4**
**Suffolk, VA 23434**

**and**

**TYSON POULTRY, INC.,**
**Serve:**
**United Agent Group Inc., Registered Agent**
**1521 Concord Pike**
**Suite 201**
**Wilmington, DE 19803**

**Defendants.**

## COMPLAINT

COMES NOW Matthew Reeves, by counsel, and moves for judgment against Defendants Tyson Farms, Inc. and Tyson Poultry, Inc., jointly and severally, and as grounds therefore states as follows:

## I. JURISDICTION AND VENUE

1. At the times material hereto, Matthew Reeves is and was a resident of Ringgold, Virginia and is and was domiciled in the Commonwealth of Virginia.

2. At the times material hereto, Mr. Reeves worked for Defendants in Ringgold, Virginia.

3. At the times material hereto, Tyson Farms, Inc. is and was a North Carolina corporation doing business in the Commonwealth of Virginia. Upon information and belief, and after a

reasonable inquiry, Tyson Farms, Inc. employed Plaintiff. Plaintiff's paychecks reflected that he was "Employed By: Tyson Farms, Inc."

4. At the times material hereto, Tyson Poultry, Inc. is and was a Delaware corporation. Defendants have represented to Plaintiff, via counsel, that Tyson Poultry, Inc. is a subsidiary of Tyson Foods, Inc., its parent corporation. Defendants have further represented to Plaintiff, via counsel, that Tyson Poultry, Inc. employed Mr. Reeves in Ringgold, VA. However, neither Tyson Foods, Inc. nor Tyson Poultry, Inc. are registered with the Virginia State Corporation Commission to do business in the Commonwealth of Virginia. Tyson Foods Local Grain Services (Amelia Co) is the only entity registered with the Virginia State Corporation Commission that begins with the words "Tyson Foods." According to the Virginia State Corporation Commission, Tyson Foods Local Grain Services (Amelia Co) is a registered fictitious name for Tyson Farms, Inc. As stated, however, Defendants have represented to Plaintiff, via counsel, that Tyson Poultry, Inc. employed Plaintiff in Ringgold, VA.

5. Upon information and belief, and after a reasonable inquiry, Defendants are joint employers, integrated employers, and/or apparent agents of one another, as it relates to Plaintiff's employment.

6. A substantial part of the acts and/or omissions of Defendants from which the causes of action arise occurred within Ringgold, Virginia, which is within Pittsylvania County.

7. Tyson employs over 100,000 team members in the United States.

## II. FACTS

8. Matthew Reeves was hired by Tyson on or about May 20, 2024.

9. At the times relevant hereto, Mr. Reeves held the role of Maintenance Mechanic Level 5.

10. Mr. Reeves is Caucasian.

11. Mr. Reeves is a Born-Again Christian.

12. Mr. Reeves' employment at Tyson was largely uneventful until co-worker Alvin Clark began employment with Tyson on or about July 30, 2024, and Mr. Reeves thereafter became associated with Mr. Clark as set forth further herein.

13. Mr. Clark is black / African American and 62 years old.

14. Mr. Clark is a well-educated, qualified maintenance mechanic.

15. Mr. Clark has an associate's degree in electrical technology and significant workplace experience relevant to his field.

16. Mr. Clark was the only Maintenance Mechanic Level 8 at the Ringgold, Virginia Tyson location, for most of Mr. Clark's employment.

17. Mr. Clark was the oldest employee in his department.

18. Mr. Clark was the only black employee that worked in his area during his shift for most of his employment.

19. When an HVAC job opened, Mr. Clark expressed interest in the role.

20. In response, Supervisor Chris Harris tried to talk Mr. Clark out of his interest in the role, indicating that Mr. Clark "didn't want that job" and informing Mr. Clark that management was "looking for someone young to do that." Tyson's Caucasian leadership also told Mr. Clark that he would not receive the promotion, despite being the most qualified employee for the promotion, because he is a "nigger."

21. At the time, Mr. Clark was the highest-ranking mechanic in his department.

22. Then, a Maintenance Electrical Technician role opened.

23. Mr. Clark again informed Supervisor Harris of his interest in the role.

24. Tyson's normal practice was to select the most qualified internal candidate, who was Mr. Clark.

25. However, the Maintenance Electrical Technician role was given to an outside hire, who was Caucasian.

26. The new hire quit within a week.

27. Thus, the Maintenance Electrical Technician role was open again.

28. Mr. Clark applied again, but he was told that there was a "test" he would have to take.

29. Mr. Clark asked Peanut, D Shift Supervisor, and Rex, A Shift Supervisor, if they had ever given any such test for that role.

30. Both Supervisor Peanut and Supervisor Rex indicated no.

31. Upon information and belief and based on a reasonable inquiry, the test that Mr. Clark was given to take was designed solely for Mr. Clark.

32. Mr. Clark took the test and passed it.

33. Thereafter, Mr. Clark was told, "ain't no nigger getting the job."

34. Mr. Clark was also told by management that they "needed someone younger."

35. Mr. Clark could easily perform the job duties of the Maintenance Electrical Technician role.

36. Mr. Clark was not selected for and never heard further about the Maintenance Electrical Technician role.

37. Mr. Clark reported the discrimination related to failing to place him in the foregoing roles to both Supervisor Harris and Tyson's Human Resources Department, but nothing was done to correct the discrimination.

38. Continuing, during his employment, Tyson's Caucasian leadership told Mr. Clark that they were going to stab him.

39. Tyson's Caucasian leadership physically pulled knives out in the plant and threatened Mr. Clark with them.

40. Tyson's Caucasian leadership told Mr. Clark that they were going to "cut [his] balls off."

41. Tyson's Caucasian leadership threatened Mr. Clark, "We're going to do you just like Paul Deshazo."

42. Paul Deshazo was a black man who worked at the local post office in Ringgold, Virginia that was killed in 1990 by a white man who cut off Mr. Deshazo's penis, put Mr. Deshazo's penis in Mr. Deshazo's mouth, shot him, and caught his car on fire.

43. Tyson's Caucasian leadership told Mr. Clark that they were going to hang him.

44. Tyson's Caucasian leadership threatened to hang Mr. Clark from a drop cord hanging from the ceiling.

45. Tyson's Caucasian leadership wrapped a forklift strap in the shape of a noose and hung it from the forks of the forklift, and then raised up the noose using the forks, in front of Mr. Clark.

46. Tyson's Caucasian leadership, Lead Dennis "DJ" Moser, pulled a gun on Mr. Clark and threatened him.

47. Supervisor Harris witnessed the discrimination and harassment of Mr. Clark firsthand and not only did nothing to stop, correct, or prevent the harassment, but incredibly, Supervisor Harris joined in by laughing about it and encouraging the horrifying harassment to continue.

48. Mr. Reeves told Tyson's employees that they needed to stop talking that way to Mr. Clark and needed to leave Mr. Clark alone.

49. In response to Mr. Reeves' requests that the race harassment against Mr. Clark stop, Tyson's Caucasian leadership referred to Mr. Reeves as a "nigger lover."

50. Tyson's Caucasian leadership told Mr. Reeves that he needed to separate from Mr. Clark as Mr. Reeves' skin was not black.

51. Tyson's Caucasian leadership told Mr. Reeves that he was not Mr. Clark's "kind."

52. Tyson's Caucasian leadership rubbed their own white wrist and told Mr. Reeves that he was not Mr. Clark's "kind."

53. Tyson's Caucasian leadership told Mr. Reeves that he should not sit at the same table as Mr. Clark.

54. Mr. Reeves quoted religious scripture to attempt to share information that may convince Tyson's employees to stop engaging in such horrendous acts.

55. In response, Lead Taylor Crews told Mr. Reeves that Lead Taylor Crews physically stood on a Bible, followed by an explicit statement.

56. Tyson's leadership pointed to a large black male employee on the cleaning crew, telling Mr. Reeves that the man would have his way and rape Mr. Reeves all night long.

57. When Mr. Reeves requested that the harassment stop, and reiterated Bible scripture, Tyson's leadership repeated the threat.

58. Tyson's leadership also made a comment about someone going in the back door of Mr. Reeves' home to have sex with or rape his wife.

59. Lead Crews also questioned Mr. Reeves, "What would you do if I broke into your house?"

60. Mr. Reeves, terrified, responded, "Don't do it, please. Don't do it. I have to protect my family."

61. On another occasion, a Lead told Mr. Reeves that he was going to see Mr. Reeves' wife when he got off work, knowing that Mr. Reeves was going to have to work all night thereafter. This Lead was aware that Mr. Reeves is a Born Again Chrisian and that such a comment would be offensive to his religious beliefs.

62. Tyson's leadership also gathered on various occasions at work to look at sexually explicit images and videos of women and children.

63. Mr. Reeves witnessed this behavior and spoke out against it to the individuals participating in it. Mr. Reeves relayed that it was sinful to view women in a lustful way.

64. It did not stop Tyson's leadership; instead, they just tried to hide it when Mr. Reeves was around and doubled down on their retaliation against him.

65. Mr. Clark also requested that this harassment stop, to no avail.

66. Instead of stopping the behavior, it exacerbated it. By way of example, on one occasion, a shift supervisor, who was much larger than Mr. Clark, grabbed Mr. Clark in a bear hug and kissed him on the face. This event was in front of the work cameras and other witnesses.

67. On another occasion, Lead Moser pulled a loaded gun on Mr. Reeves and Mr. Clark in Tyson's parking lot and attempted to shoot Mr. Clark, but the gun jammed.

68. Mr. Reeves had to roll up the window and flee in the vehicle as Tyson's Caucasian leadership was lifting Mr. Clark up by pulling on his shirt.

69. Tyson's Caucasian leadership stated to Mr. Reeves and Mr. Clark, "We don't have to get you now, we'll get you down the road."

70. This event happened within view of Tyson's security cameras.

71. Thereafter, Mr. Reeves and Mr. Clark lived in fear of leaving work each day, fearing they would be followed and killed by Tyson's leadership.

72. Supervisor Harris stated that they were not going to be hiring anyone without prior mechanical experience. Yet, not long after Mr. Clark's and Mr. Reeves' lives were threatened, and they were told that they were going to be gotten "down the road," Tyson's management hired Mr. Clark's neighbor, who had no mechanical experience, and then threatened Mr. Clark that they knew where he lives and insinuated that they had eyes on his every movement now that they had sought out and hired his neighbor to work there.

73. Supervisor Harris even went inside Mr. Clark's vehicle, without permission, one day, for unknown reasons.

74. Mr. Clark feared for his safety so greatly that he did not return to his home and instead stayed in hotels trying to figure out what to do so that he was not located by Tyson's employees and murdered.

75. Mr. Clark also asked Lead Crews to stop Lead Moser from harassing him.

76. While Lead Crews harassed Mr. Reeves and Mr. Clark, he was the lesser of the two evils between Lead Moser and Lead Crews.

77. Nevertheless, nothing changed.

78. This horrific discrimination and retaliation persisted for months.

79. The race harassment was not only directed at Mr. Clark.

80. For example, Michael Terry Nowlin, Downtime Specialist, yelled out, in the presence of a female cleaning employee, who is black, "I can say whatever I want, black, black, black, black, black." She left the area, upset.

81. On one occasion, Mr. Clark asked Lead Moser why he did not like black people. Lead Moser responded, "I just don't like niggers, I just don't."

82. At the brink of a mental breakdown, Mr. Reeves and Mr. Clark requested a single day off work.

83. HR approved both Mr. Reeves and Mr. Clark having the day off.

84. Mr. Reeves and Mr. Clark reported to HR that they feared that Supervisor Harris would retaliate if they were granted the day off.

85. HR assured Mr. Reeves and Mr. Clark that they would not be retaliated against for requesting and receiving the day off work, stating that Mr. Reeves and Mr. Clark should not "worry about Chris [Harris]", and confirming their neither Mr. Reeves nor Mr. Clark would be assessed attendance points. Mr. Reeves asked if either of them needed to call into the attendance line, and HR responded, "no, don't worry about it because I'm going to send Chris [Harris] an email, and he will not give you a point. I'll make sure of that. We're going to take care of it," or words to that effect.

86. However, after Mr. Reeves utilized the day off, he was assessed three attendance points.

87. Mr. Reeves reported this retaliation to HR, who took no action to remedy the retaliation.

88. On March 14, 2025, Mr. Reeves and Mr. Clark called Tyson's Concerns Hotline regarding how Supervisor Harris was also forcing them to work in unsafe conditions:

REPORT DETAILS

**Report Submission Date**
3/14/2025

**Reported Company/Branch Information**
Location Danville Plant
1725 Cane Creek Parkway Ringgold, VA 24586
City/State/Zip: Ringgold, VA, 24586, United States of America )

**What is your relationship to Tyson?**
Team Member

**Details**
Since May 20, 2024, Chris John Harris, supervisor, has always been rushing employees (names and job titles unknown) to go out to hazardous conditions to assemble the machine when it is not read disregard the safety of employees. A coworker (name and job title unknown) was once sprayed by chemicals in the eye because the machine was not ready to assemble and was rushed to assemble has been addressed with Chris; however he gets upset with the employees. The issue is still ongoing.

**Follow-Up Notes**
There are no additional notes for this report.

**Follow-Up Questions/Comments**
**3/14/2025 11:15 AM posted by Organization**
Thank you for reporting your concern to the Tyson Help Line. We strive to forward these to the appropriate parties for handling as quickly as possible. Please check for additional follow up regularly.

**Chat Transcripts**
There are no chat transcripts for this incident.

89. With regard to the safety issues, every morning around 3am, after the cleaning crew finished cleaning, it was time for maintenance to reassemble the machines. However, Supervisor Harris directed Mr. Reeves and Mr. Clark to reassemble before the cleaners had finished spraying acids and other cleaning agents, which caused Mr. Reeves and Mr. Clark to be unable to breathe.

90. Despite protest, Supervisor Harris forced Mr. Reeves and Mr. Clark to go out and begin the work before the workplace was safe.

91. On one such occasion, Tyson was understaffed. Mr. Reeves and Mr. Clark were working together to disassemble an extremely heavy steel pipe when the slippery pipe broke Mr. Clark's nose. The pipe was slippery from the cleaning agent that the cleaning crew used. Mr. Clark went to the bathroom and popped his broken nose into place, using dressings and bandages to stop the profuse bleeding. Mr. Clark told Supervisor Harris that he needed to go to the ER to have it checked, but Supervisor Harris told him, "Just go back to work." Mr. Clark sought medical care thereafter. Mr. Clark was diagnosed with a nasal fracture, had some restrictions for a week related to wearing anything on his face and refraining from pushing and/or pulling to prevent pressure on his face, and then he was returned to full duty. The injury left a scar/bump on Mr. Clark's nose.

92. On another occasion, Mr. Clark was sprayed in the eyes with a chemical cleaning agent, which caused his voice to change and his eyes to swell up.

93. Supervisor Harris made it apparent that he knew Mr. Reeves and Mr. Clark were the source of the report — it was about the unsafe conditions the two had endured, thus it was not very hard to put together.

94. After making the report, Supervisor Harris doubled down and amplified the times he demanded that Mr. Reeves and Mr. Clark begin their work before the conditions were safe.

95. Supervisor Harris' demands that Mr. Reeves and Mr. Clark put themselves in physical danger and work in unsafe conditions were a continuation of the discrimination and retaliation the two were enduring and an effort to force them to resign.

96. Tellingly, on one occasion, a very heavy gearbox fell on Mr. Reeves, pinning him against a steel rail, obstructing his ability to breathe. Mr. Clark was the only individual who helped Mr. Reeves escape; when Supervisor Harris was notified immediately thereafter, he could not bother himself to even stop scrolling on his phone.

97. On March 19, 2025, within 4 days of calling Tyson's Concerns Hotline, Mr. Reeves and Mr. Clark were brought to the office and questioned about leaving work on a prior occasion for a very short lunch break, and then they were walked out of work and suspended "pending further investigation."

98. Employees frequently left work at Tyson for a lunch break without clocking out.

99. In fact, Supervisor Harris often changed employees' time punches to reflect that they were working when they were not.

100. At no time did either Mr. Reeves or Mr. Clark attempt to steal time by going to lunch.

101. Moreover, neither Mr. Reeves nor Mr. Clark had been warned about this being a problem, and they witnessed their colleagues frequently doing the same thing.

102. On March 26, 2025, both Mr. Reeves and Mr. Clark were called and informed that their employment was terminated.

103. While Mr. Reeves and Mr. Clark were told that they had the right to appeal and that someone would call them regarding the appeal, no one ever contacted either of them further.

104. Mr. Reeves and Mr. Clark were both stellar employees.

105. Mr. Reeves was informed that he was doing well and received a raise during his employment.

106. Mr. Reeves was never written up during his employment.

107. Despite Mr. Reeves and Mr. Clark reporting the foregoing harassment to Tyson's HR, the harassers remained employed by Tyson.

## COUNT I: TITLE VII HOSTILE WORK ENVIRONMENT

108. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

109. Mr. Reeves timely filed a Complaint with the Equal Employment Opportunity Commission on April 22, 2025, and filed this suit within 90 days of receipt of the Notice of Right to Sue, which was issued on January 8, 2026 (Ex. A).

110. Mr. Reeves has had an association with Mr. Clark, who identifies his color / race as Black / African American. In reference to Mr. Reeves' association with Mr. Clark, Tyson's Caucasian leadership referred to Mr. Reeves as a "nigger lover."

111. Mr. Reeves is a Born-Again Christian.

112. Defendants had a duty to maintain a work environment free of race / color-

association and religious discrimination and harassment.

113. Defendants' action and inaction created a hostile and offensive work environment to Plaintiff that interfered with Plaintiff's work.

114. Defendants knew or should have known of the hostile work environment and failed to take prompt remedial action reasonably calculated to end the harassment.

115. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

116. At all times material hereto, Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to the protected rights of Plaintiff so as to support an award of punitive damages.

117. The above-described acts of Defendants constitute race / color-association and religious harassment and a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*

**COUNT II: VHRA HOSTILE WORK ENVIRONMENT**

118. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

119. Mr. Reeves timely filed a Complaint with the Equal Employment Opportunity Commission on April 22, 2025, and filed this suit within 90 days of receipt of the Notice of Right to Sue, which was issued on January 8, 2026 (Ex. A).

120. Mr. Reeves has had an association with Mr. Clark, who identifies his color / race as Black / African American. In reference to Mr. Reeves' association with Mr. Clark, Tyson's Caucasian leadership referred to Mr. Reeves as a "nigger lover."

121. Mr. Reeves is a Born-Again Christian.

122. Defendants had a duty to maintain a work environment free of race / color-association and religious discrimination and harassment.

123. Defendants' action and inaction created a hostile and offensive work environment to Plaintiff that interfered with Plaintiff's work.

124. Defendants knew or should have known of the hostile work environment and failed to take prompt remedial action reasonably calculated to end the harassment.

125. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer loss of employment, pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

126. At all times material hereto, Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to the protected rights of Plaintiff so as to support an award of punitive damages.

127. The above-described acts of Defendants constitute race / color-association and religious harassment and a hostile work environment, all in violation of the Virginia Human Rights Act, Va. Code §2.2-3905.

## COUNT III: CLAIM FOR TITLE VII RETALIATION

128. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

129. Mr. Reeves timely filed a Complaint with the Equal Employment Opportunity Commission on April 22, 2025, and filed this suit within 90 days of receipt of the Notice of Right to Sue, which was issued on January 8, 2026 (Ex. A).

130. Defendants retaliated against Plaintiff by harassing him and terminating his employment due to his complaints of race / color discrimination, race / color-association discrimination, religious discrimination, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

131. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer pecuniary loss, mental anguish, pain and suffering, shame, humiliation, embarrassment, loss of enjoyment of life and other non-pecuniary loss.

132. Defendants acted willfully toward Plaintiff with actual malice or with reckless disregard of the protected rights of Plaintiff so as to support an award of award of punitive damages.

133. The above-described acts of Defendants constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq*.

**COUNT IV: CLAIM FOR VHRA RETALIATION**

134. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

135. Mr. Reeves timely filed a Complaint with the Virginia Office of Civil Rights on April 22, 2025, and filed this suit within 90 days of receipt of the Notice of Right to Sue, which was issued on January 8, 2026 (Ex. A).

136. Pursuant to Va. Code § 2.2-3905(B)(7), "It is an unlawful discriminatory practice for: (7) (i) An employer to discriminate against any employees … because such individual has opposed any practice made an unlawful discriminatory practice by this chapter [Chapter 39: Virginia Human Rights Act] …."

137. Mr. Reeves opposed practices made unlawful discriminatory practices by Chapter 39 when he reported race, race-association, color, color-association, sex, religious, and age discrimination and retaliation.

138. Defendants retaliated against Plaintiff by harassing him and terminating his employment due to his complaints of race, race-association, color, color-association, sex, religious, and age discrimination and retaliation in violation of the VHRA.

139. As a direct and proximate result of Defendants' actions Plaintiff has suffered and will continue to suffer pecuniary loss, compensatory damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

140. Defendants acted with malice or with willful and wanton disregard for the rights of Plaintiff, thereby supporting an award of punitive damages.

141. Pursuant to Va. Code § 2.2-3908(B), "the court or jury may award to the plaintiff, as the prevailing party, compensatory and punitive damages and the court may award reasonable attorney fees and costs and may grant as relief any permanent or temporary injunction, temporary restraining order, or other order, including an order enjoining the defendant from engaging in such practice, or order such affirmative action as may be appropriate."

142. The above-described acts by Defendants and employees of Defendants constitute retaliation in violation of the Virginia Human Rights Act, Va. Code §§ 2.2-3900, *et seq*.

**COUNT V: RETALIATION IN VIOLATION OF VA CODE § 40.1-27.3**

143. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

144. Va. Code § 40.1-27.3(A)(1) states that "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action

regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee: Or a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor[.]"

145. Mr. Reeves reported to his supervisors and Tyson's hotline in good faith violations of at least Title VII of the Civil Rights Act, Section 1981, the ADEA, the VHRA, OSHA, Va. Code § 40.1-51.2, and Va. Code § 18.2-57.

146. Tyson retaliated against Mr. Reeves for his protected activity by terminating his employment.

147. Tyson's retaliatory act happened in close temporal proximity to Mr. Reeves' protected acts.

148. During his employment, Mr. Reeves met or exceeded Tyson's reasonable business expectations.

149. Mr. Reeves was retaliated against due to his protected acts in violation of Va. Code § 40.1-27.3.

150. As a direct and proximate result of the retaliation against Mr. Reeves, he has suffered and will continue to suffer pecuniary loss.

151. Pursuant to Va. Code § 40.1-27.3, Mr. Reeves is entitled to "(i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs."

## COUNT VI: DISCRIMINATION IN VIOLATION OF VA. CODE § 40.1-51.2:1

152. Plaintiff incorporates by reference herein the preceding paragraphs of this

Complaint.

153. Plaintiff engaged in the protected activity of reporting workplace safety violations to his supervisors and Tyson's Hotline.

154. Defendants discriminated against Plaintiff in violation of Va. Code § 40.1-51.2:1 for engaging in protected activities by terminating his employment.

155. Pursuant to Va. Code § 40.1-51.2:2, Plaintiff has exhausted all administrative remedies for his Va. Code § 40.1-51.2:1 discrimination claim. Specifically, Plaintiff filed a safety whistleblower retaliation complaint with the Virginia Department of Labor and Industry ("the DOLI") on April 22, 2025, within 60 days of his termination from employment, and the DOLI has since closed their investigation.

156. Plaintiff seeks, and is entitled to, all appropriate relief for this claim pursuant to Va. Code § 40.1-51.2:2(B), which pursuant to the DOLI's VOSH Program Directive 04-011E, issued July 1, 2016, includes injunctive and equitable relief, including reinstatement, or front pay in lieu of reinstatement, compensatory damages, including lost wages and benefits and emotional pain and suffering damages, and punitive damages. In addition, pursuant to *Prop. Damage Specialists, Inc. v. Rechichar*, 292 Va. 410 (2016), the violation should be abated "without economic loss to the employee," thus including attorneys' fees and costs in appropriate relief and entitling Plaintiff to attorneys' fees and costs.

**COUNT VII: CLAIM FOR TITLE VII RACE / COLOR-ASSOCIATION AND RELIGIOUS DISCRIMINATION**

157. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

158. Mr. Reeves timely filed a Complaint with the Equal Employment Opportunity Commission on April 22, 2025, and filed this suit within 90 days of receipt of the Notice of Right to Sue, which was issued on January 8, 2026 (Ex. A).

159. Mr. Reeves has had an association with Mr. Clark, who identifies his color / race as Black / African American. In reference to Mr. Reeves' association with Mr. Clark, Tyson's Caucasian leadership referred to Mr. Reeves as a "nigger lover."

160. Mr. Reeves is a Born-Again Christian.

161. During his employment, Mr. Reeves met or exceeded Tyson's reasonable business expectations.

162. Mr. Reeves was terminated from employment due to his association with Mr. Clark, based on Mr. Clark's race/color, and Mr. Reeves' religion.

163. Any reasons given by Tyson for terminating Mr. Reeves' employment are pretextual in nature.

164. Because the actions of Tyson supervisory employees were taken within the scope of their employment, Tyson is responsible for their actions based upon the doctrine of *respondeat superior.*

165. As a direct and proximate result of Tyson's actions, Mr. Reeves has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

166. At all times material hereto, Tyson engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Mr. Reeves so as to support an award of punitive damages.

167. The above-described acts by Tyson and employees of Tyson constitute race / color-

association and religious discrimination in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.

**COUNT VIII: CLAIM FOR RACE / COLOR-ASSOCIATION AND RELIGIOUS DISCRIMINATION IN VIOLATION OF THE VIRGINIA HUMAN RIGHTS ACT**

168. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

169. Mr. Reeves timely filed a Complaint with the Virginia Office of Civil Rights on April 22, 2025, and filed this suit within 90 days of receipt of the Notice of Right to Sue, which was issued on January 8, 2026 (Ex. A).

170. Mr. Reeves has had an association with Mr. Clark, who identifies his color / race as Black / African American. In reference to Mr. Reeves' association with Mr. Clark, Tyson's Caucasian leadership referred to Mr. Reeves as a "nigger lover."

171. Mr. Reeves is a Born-Again Christian.

172. During his employment, Mr. Reeves met or exceeded Tyson's reasonable business expectations.

173. Mr. Reeves was terminated from employment due to his association with Mr. Clark, based on Mr. Clark's race/color, and Mr. Reeves' religion.

174. Any reasons given by Tyson for terminating Mr. Reeves' employment are pretextual in nature.

175. As a direct and proximate result of Defendants' actions, Mr. Reeves has suffered and will continue to suffer pecuniary loss, compensatory damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

176. Pursuant to Virginia Code § 2.2-3908, "the court or jury may award to the plaintiff, as the prevailing party, compensatory and punitive damages and the court may award reasonable

attorney fees and costs and may grant as relief any permanent or temporary injunction, temporary restraining order, or other order, including an order enjoining the defendants from engaging in such practice, or order such affirmative action as may be appropriate."

177. The above-described acts by Defendants and employees of Defendants constitute discrimination in violation of the Virginia Human Rights Act, Va. Code Ann. §§ 2.2-3901, *et seq*.

WHEREFORE, Plaintiff Matthew Reeves prays for judgment against Defendants Tyson Farms, Inc. and Tyson Poultry, Inc., jointly and severally, and for equitable relief, injunctive relief, compensatory damages, including emotional pain and suffering, back pay and benefits, reinstatement and/or front wages and benefits, punitive damages, costs, attorneys' fees, and post judgment interest pursuant to Va. Code § 8.01-382 and Va. Code § 6.2-302, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

**MATTHEW REEVES**

By Brittany M. Haddox

Brittany M. Haddox (VSB No. 86416)
HADDOX LAW
1203 Texas Street
Salem, VA 24153
brittany@haddox.law
540-765-4284
*Counsel for Plaintiff*